**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Northeastern Lumber
Manufacturers Assoc.

     v.                                    Civil No. 09-cv-290-JM
                                                Opinion No. 2010 DNH 080P
Northern States Pallet
Company, Inc. and
James H. Jackson


**O R D E R**


     Plaintiff Northeastern Lumber Manufacturers Association ("NeLMA") is a trade association that certifies the grade and quality of lumber and whether lumber used in wood packaging materials has been treated according to industry standards governing the control of wood-borne insects and plant-based diseases.  Defendants Northern States Pallet Company, Inc. ("Northern States") and its president, James H. Jackson ("Jackson"), were engaged in the sale, service and removal of wood pallets used in shipping both domestically and overseas.  In this action, NeLMA alleges defendants misappropriated a certification stamp and used it to mark untreated lumber as actually comporting with industry safety standards.  Before the

court is NeLMA's motion for partial summary judgment on counts
one, two and three, which assert claims of trademark infringement
and unfair competition in violation of The Lanham Act, 15 U.S.C.
§ 1501, et seq. ("the Lanham Act"), and the New Hampshire
Consumer Protection Act, N.H. Rev. Stat. Ann. Ch. 358-A ("CPA").
Document no. 38.  Defendants object, contending NeLMA does not
have viable trademark claims or unfair competition claims because
its registered marks cover lumber, not wood packaging materials
("WPM") like the pallets defendants used, and NeLMA has not
controlled the use of the marks in its certification programs.
For the reasons set forth below, plaintiff's motion is denied in
part and granted in part.

<u>Discussion</u>

**1. Uncontested Facts**

NeLMA is accredited by the American Lumber Standards
Committee ("ALSC") to provide inspection services to facilities
that manufacture timber, lumber and wood packaging materials, and
has been engaged in this type of work since at least 2002.  <u>See</u>
Pl.'s Mot. for Summ. J., 9/4/09 Easterling Aff. (document no.
12.4) ("Easterling Aff."), ¶ 8.  NeLMA owns trademarks which it
promotes as certifying to both the industry and the public that

2

lumber used in WPM complies with national and international standards.  See Pl.'s Statement of Material Facts (document no. 38.3) ("Pl.'s Facts"), ¶¶ 3-4.  NeLMA owns two marks:  No. 2731831 (the "831 mark"), registered on July 1, 2003; and No. 3061638 (the "638 mark"), registered on February 28, 2006.  See Pl.'s Facts, ¶ 1.[1]  The registration forms for both marks state:  "The certification mark, as used by authorized persons, certifies the quality level of the grade of lumber on which it is placed." See Defs.' Resp. to Pl.'s Facts (document no. 40.2) ("Defs.' Resp.") at 6 (quoting Defs.' Mot. to Supp. Obj. to Pl.'s Mot. for Expedited Relief, Ex. 2 (9/30/09 Aff. of Jeffrey L. Snow) (document no. 23-2)) ("9/30/09 Snow Aff."), ¶¶ 1 & 2 (attaching copies of the marks' registrations with the U.S. Patent and Trademark Office ("PTO")).  The registrations also state that the marks are for "Lumber, in Class A," with the 831 mark stating its "First Use In Commerce [was] 2-1-1971," and the 638 mark's "First Use In Commerce [was] 5-1-2004."  See id.

NeLMA enforces two distinct certification programs:  one for softwood lumber products and one for wood packaging materials.

---

[1]The 831 mark is NeLMA's logo, which depicts three trees growing out of the word NeLMA, inside a circle.  The 638 mark is simply the word "NeLMA" in bold, block letters.  See Easterling Aff., Ex. A.

With respect to the softwood lumber products, NeLMA is authorized by ALSC to issue to lumber and timber manufacturers stamps that are used to reflect the grade of the wood based on preset industry standards for quality and size.[2]  NeLMA provides instruction, supervision and technical information about grading to lumber and timber manufacturers throughout the Northeastern and Great Lakes regions of the United States, who agree to regular inspections by NeLMA to ensure the grading standards are being followed.  See 9/30/09 Snow Aff., ¶ 3 (attaching article on lumber grading from NeLMA's website).

With respect to wood packaging materials, NeLMA inspects the facilities that produce WPM to ensure they are following certain international safety standards that are designed to reduce the phytosanitary[3] problems caused by the spread of wood-borne insects and diseases through WPM used in global trade.  NeLMA's

---

[2]The standards are known as Voluntary Product Standards that are set by the National Institute for Standards and Technology ("NIST"), an agency of the U.S. Department of Commerce.  See 9/30/09 Snow Aff., ¶ 3 (attaching an article posted on NeMLA's website).  Lumber must comply with PS 20-05.  See id.

[3]Phytosanitary is derived from two Greek words, phyto meaning plant and sanitary, meaning clean.  Phytosanitary certification is required by many countries for the import and export of nonprocessed, plant and agricultural products.  See http://ask.reference.com/related/Phytosanitary+Certificate?

4

inspection program follows the "International Standard for
Phytosanitary Measures ("ISPM") - Guidelines for Regulating Wood
Packaging Material in International Trade."[4]  See id., ¶ 4
(attaching article on WPM inspection from NeLMA's website); see
also Pl.'s Facts, ¶¶ 7-8.  ISPM 15 requires all lumber used in
WPM to be treated either by a heat process or a chemical
fumigation process.  Id. ¶¶ 9-10.  NeLMA certification indicates
that lumber was heat treated, not chemically treated.  Id. ¶ 11;
see also 9/30/09 Snow Aff. ¶ 4 (attaching web pages).  ALSC-
accredited inspection agencies like NeLMA examine the facilities
using WPM and certify that the facilities are following IPSM 15.
Once certified, each facility gets its own IPPC stamp that
includes the IPPC logo, the facility's unique number, and the
logo of the certifying agency, such as NeLMA.  See id.

　　　Heat treatment of lumber is a two-step process.  See id.  At
the first step, each piece of heat-treated lumber is marked with
an "HT" stamp and an ALSC-accredited inspection certification
stamp, like NeLMA's logo.  Then the certified facility uses the
heat-treated lumber to manufacture finished WPM, such as pallets,

---

[4]These standards were developed at the International Plant
Protection Convention ("IPPC") in March 2002 and have been
adopted by more than 150 participating countries.

skids, crates or boxes.  See id.; see also Pl.'s Facts ¶ 12-16.
The cut pieces of the heat-treated lumber do not each need to be
stamped, but the finished WPM item must display its certification
stamps on at least two opposite sides, clearly visible to customs
officials and signifying to them that the item complies with ISPM
15.  Id. ¶ 17; see also 9/30/09 Snow Aff. ¶ 4 (attaching NeLMA's
web pages).

     The NeLMA logo is a valuable asset to the certified facility
using it, because it is widely accepted as a sign of quality
assurance.  See Pl.'s Facts, ¶¶ 18-19.  Defendants were neither
certified by NeLMA nor authorized to use NeLMA's marks, yet
Jackson admitted to having used a NeLMA stamp in his business
from 2006 until NeLMA discovered that unauthorized use in the
summer of 2009.  Id. ¶¶ 20, 25-27, 29 & 31-32.  Northern States
sold new and recycled pallets and skids, with the type of heat-
treated pallets at issue here representing about 5% of its annual
business.  See Pl.'s Mot. for Leave to File Response, Att. 3,
8/31/09 Aff. of James H. Jackson (document no. 7.3) ("Jackson
Aff."), ¶¶ 4 & 5.  In 2006, another company, Index Packaging,
Inc. ("Index Packaging"), which was a facility certified by NeLMA
to heat-treat WPM, delivered some pallets to Northern States.

Jackson found Index Packaging's NeLMA-issued stamp on a trailer and took it, in order to stamp Northern States' wooden pallets, despite knowing that Northern States was not certified and was not following ISPM 15.  See id. ¶¶ 20-25, 27, 29, 31-32.  Jackson understood that using a NeLMA stamp created the misimpression that Northern States' WPM had been heat treated, and he also understood the environmental risks that his noncompliance with ISPM 15 created.  See id. ¶¶ 28-33.

NeLMA's certification program involves regular inspection of certified facilities, including their equipment and inventory, yet NeLMA did not realize that Index Packaging's stamp was missing for nearly three years before it was returned on August 19, 2009.  See Jackson Aff. ¶ 8; see also Defs.' Resp., Ex. 1 (document no. 40.3).  After returning the Index Packaging stamp, Northern States had no other certification stamp or any other stamp resembling plaintiff's marks at issue here.  Northern States also has depleted its inventory of all the wooden pallets that bore the Index Packaging stamp with NeLMA's mark.  See id. ¶¶ 8-9.

## 2.  Standard of Review

Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986), and a material fact is one "that might affect the outcome of the suit." Id. at 248. The evidence and all inferences reasonably drawn therefrom must be construed in the light most favorable to the nonmovant. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the burden shifts to the nonmovant to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol

<u>Myers-Squibb Co.</u>, 95 F.3d 86, 94 (1st Cir. 1996) (citing <u>Celotex</u>, 477 U.S. at 323 and <u>Anderson</u> 477 U.S. at 249).  Neither conclusory allegations, improbable inferences, nor unsupported speculation are sufficient to defeat summary judgment.  <u>See</u> <u>Carroll v. Xerox Corp.</u>, 294 F.3d 231, 236-37 (1st Cir. 2002); <u>see</u> <u>also</u> <u>Price v. Canadian Airlines</u>, 429 F. Supp. 2d 459, 461 (D.N.H. 2006).

### 3.  Default Judgment against Northern States

On April 16, 2010, default judgment was entered by the court against Northern States.  <u>See</u> Document no. 48; <u>see</u> <u>also</u> Fed. R. Civ. P. 55.  Plaintiff's claims remain only against Jackson and shall be analyzed accordingly.

### 4.  Lanham Act Trademark Infringement & Unfair Competition

Plaintiff argues it is entitled to summary judgment on both counts one and two because Jackson's admissions demonstrate there is no genuine dispute that he knowingly misused NeLMA's marks to misrepresent that his pallets had been heat-treated in compliance with ISPM 15.  In Count I, plaintiff alleges Jackson's repeated, unauthorized use of its marks constituted trademark infringement,

in violation of 15 U.S.C. § 1114.[5]  In Count II, plaintiff
alleges he is also liable under 15 U.S.C. § 1125 for unfair
competition, because he misrepresented and falsely designated the
origin of certain pallets by passing them off as having been
heat-treated in compliance with ISPM 15 when they had not been.[6]
Plaintiff also asserts that Jackson's deliberate misuse of
NeLMA's marks has destroyed its goodwill and value, entitling it

---

[5]15 U.S.C. § 1114(1) (West 2009) provides, in relevant part:
"Any person who shall, without consent of the registrant, (a) use
in commerce any reproduction, counterfeit, copy, or colorable
imitation of a registered mark in connection with the sale,
offering for sale, [or] distribution . . . of any goods or
services . . . is likely to cause confusion, or to cause mistake,
or to deceive; or (b) reproduce, counterfeit, copy, or colorably
imitate a registered mark and apply such reproduction . . . to .
. . packages. . . intended to be used in commerce. . . which is
likely to cause confusion, or to cause mistake, or to deceive,
shall be liable in a civil action by the registrant for the
remedies hereinafter provided."

[6]15 U.S.C. § 1125(a)(1) (West 2009) provides:  "Any person
who, on or in connection with any  goods or services, or any
container for goods, uses in commerce any word, term name,
symbol, or device, or any combination thereof, or any false
designation of origin, false or misleading description of fact,
or false or misleading representation of fact, which (A) is
likely to cause confusion, or to cause mistake, or to deceive as
to the affiliation, connection, or association of such person
with another person, or as to the origin, sponsorship, or
approval of his or her goods, services, or commercial activities
by another person, . . . shall be liable in a civil action by any
person who believes that he or she is or is likely to be damaged
by such act."

to injunctive relief and treble damages under 15 U.S.C.
§§ 1116(d) & 1117(b).

Plaintiff only argues the facts, not citing any cases to
support its position.  Jackson does not dispute that he marked
Northern States' pallets with the Index Packaging-NeLMA stamp,
knowing that the pallets had not been certified by NeLMA and had
not otherwise complied with the heat-treatment requirements of
ISPM 15.  He also concedes that he shipped those mislabeled
pallets into the stream of commerce, understanding that customers
and government officials would think the pallets complied with
ISPM 15 and were pest-free.  But Jackson asserts this conduct did
not violate either § 1114 or § 1125.  Jackson makes two arguments
in support of this position.

First, he argues that NeLMA's marks do not cover WPM, but
instead are limited to lumber.  Jackson contends that because the
misused stamp bore NeLMA's mark for the quality and grade of
lumber, not for WPM compliance with ISPM 15, his use of the stamp
on pallets did not infringe, misappropriate, devalue or otherwise
misuse NeLMA's marks in violation of the Lanham Act.  Jackson
asserts that the separate certification programs for lumber and
WPM, including both the distinct governing standards and the

11

different overseeing agencies, demonstrate that NeLMA's marks at issue here would not confuse, deceive or cause mistake in the minds of the relevant public about the quality or origins of his pallets.  As Jackson explains:  "NeLMA and the relevant industry treat lumber and wood packaging materials such as pallets as *separate* products and distinguish between the certification programs for them."  Defs.' Obj. to Pl.'s Mot. for Partial Summ. J. (document no. 40) ("Defs.' Obj.") at 3 (emphasis in original).

Second, Jackson argues that his misuse of Index Packaging's stamp did not violate the Lanham Act because NeLMA has not adequately policed its marks or enforced its ISPM certification program.  Because NeLMA did not even realize defendants had the stamp for nearly three years, Jackson contends NeLMA cannot claim its certification program was violated, misrepresented or devalued when NeLMA was not itself effectively overseeing it.

Likelihood of confusion is the critical issue in both plaintiff's trademark infringement and its unfair competition claims.  See Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc., 288 F. Supp. 2d 105, 113 (D.N.H. 2003) (citing authority), aff'd, 105 Fed. Appx. 285 (1st Cir. 2004).  "The Act protects both the public and the owner of a trademark by 'preventing the use of the

same or similar marks in a way that confuses the public about the actual source of the goods or service.'"   Id. (quoting Star Fin. Servs. v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996)). To prevail, plaintiff must establish (1) that it uses the marks and so "owns" them, (2) that defendants used the same or similar marks, and (3) that defendants' use is likely to confuse the public and harm plaintiff as a result.   See id. at 113-14.   The facts clearly establish that plaintiff owns its marks and that defendant used them.   The critical question on summary judgment, therefore, is whether Jackson's use of the marks caused the requisite confusion.

Whether Jackson's use of the Index Packaging stamp caused confusion to NeLMA's detriment is a question of fact, considering the following eight factors:   "'(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark.'"   Id. at 114 (quoting Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987).   Assessing the record

13

against these factors demonstrates that plaintiff has not carried its burden of proving its marks were infringed.  While certain factors, such as the similarity of the marks, the defendant's intent and the strength of plaintiff's mark point toward finding Jackson's use of Index Packaging's stamp was deliberately done to cause the relevant public of potential customs officials and buyers to believe his pallets complied with ISPM 15, there remain genuine questions about what NeLMA's marks in fact covered that are not answered by the evidence before the court.

As an initial matter, nowhere in the record is there any depiction of the Index Packaging stamp that Jackson used to demonstrate how NeLMA's marks were misused.  The record indicates that certified facilities are issued a stamp which has three parts to it:  the IPPC logo, the facility's unique number, and the certifying agency's stamp, NeLMA's here.  What that stamp looks like and which of NeLMA's marks is part of the stamp is completely unclear.  Are the three component parts together on one stamp, which tri-part stamp is then branded onto two sides of the WPM to certify that it comports with ISPM 15 standards?  Or does the WPM just have to show all three marks somewhere on two separate sides, so that a NeLMA-marked piece of cut-up lumber is

14

sufficient to show ISPM 15 compliance?  The record suggests that
the certification stamp for ISPM 15 compliance requires all three
parts, as well as the letters "HT" branded onto the wood.  Based
on my understanding of the current record, NeLMA's logo alone
would not communicate that the WPM complied with ISPM 15.

Second, the registration forms for both the 831 mark and the
638 mark state that, "The certification mark, as used by
authorized persons, certifies the quality level of the grade of
lumber on which it is placed."  See 9/30/09 Snow Aff., ¶¶ 1 & 2.
The registrations also state that the marks are for "Lumber, in
Class A, . . .."  Id.  Certification marks work as a seal of
approval of the mode of manufacture, the quality of the goods or
some other characteristic of goods or services.  See 3 R.
Callmann, Callmann on Unfair Competition, Trademarks and
Monopolies, 4th ed. (West 2009) ("Callmann") § 17:18; see also 3
J. Thomas McCarthy, McCarthy on Trademarks and Unfair
Competition, 4th ed. (West 2009) ("McCarthy") §§ 19:90-91
(describing certification marks).  NeLMA asserts that its
certification programs work to preserve certain standards of
quality in the lumber industry, and it has a well-established
reputation that its marks guarantee a certain level of quality.

15

While that very well may be true, and Jackson's use of the Index
Packaging stamp that incorporated NeLMA's logo substantiates that
assertion, the record is entirely unclear about the meaning of
the "quality level of the grade of lumber."  Does quality level
mean that the lumber comports with PS 20-05, or does quality
level mean that the lumber complies with the processes required
by ISPM 15, or does it mean both?  Lumber is obviously the
primary component of wood packaging materials, so certification
of the lumber could designate certification of the WPM, <u>see</u> 3
<u>McCarthy</u> § 19:92.50; however, the "grade" of lumber designated by
NeLMA's marks does not necessarily mean that it has been heat-
treated in accordance with ISPM 15, as NeLMA's inspection program
certifies.  Based on the record before me, the 831 and 638 marks
themselves do not communicate any clear message about compliance
with international phytosanitary standards.

There are genuine issues of material fact about what
Jackson's use of Index Packaging's stamp actually said to the
relevant public.  Jackson contends NeLMA is primarily involved in
the lumber industry, as reflected by the registration statements
of both the 831 and the 638 marks, so his use of the Index
Packaging stamp on his WPM pallets did not cause any confusion.

16

But NeLMA describes its business as:

> NeLMA's signature service includes extensive
> up-to-date communications regarding the
> global implementation of [ISPM 15].  An easy
> reference summary of the latest information,
> in table format for each country, is provided
> on a regular basis and available online 24/7
> to our customers.  This valuable information
> tool is also available by subscription to others
> interested in staying abreast with the latest
> global wood packaging requirements.. . .  In
> addition, the NeLMA staff is available upon
> request to present the details of the [ISPM
> 15 packaging standard] and the NeLMA Inspection
> Program to company personnel as a valuable
> service to potential customers or industry groups.

9/30/09 Snow Aff., ¶ 4 (attaching pages from website).  This

evidence demonstrates that NeLMA considers its primary service as

helping enforce ISPM 15, not regulating the American lumber

industry as Jackson proffers.  How NeLMA uses its marks to

signify its ISPM 15 inspection service as compared to its PS 20-

05 inspection service is not clear.  Maybe the marks indicate

compliance with both standards.  In any event, NeLMA has not made

the requisite showing of clearly demonstrating what the 831 mark

or the 638 mark represent.  See 3 McCarthy § 19:93 (requiring

that registered certification marks symbolize a designated

service).

    These unanswered questions require me to deny plaintiff's

motion for summary judgment on its Lanham Act claims against
Jackson.   This denial does not mean Jackson did not violate the
Lanham Act; it simply means that plaintiff has not shown that the
record leads to the single conclusion that Jackson's use of the
Index Packaging stamp infringed its marks in violation of 15
U.S.C. §§ 1114 & 1125.   Genuine issues of material fact remain
about what NeLMA's marks actually convey to the relevant public.
See id. §§ 19:91 & 19:92.50.

**5.  N.H. Consumer Protection Act Claim**

In Count III, NeLMA alleges that Jackson's unauthorized use
of its marks in his packaging business was a deceptive business
practice in violation of the CPA.   See N.H. Rev. Stat. Ann.
("RSA") 358-A:1, et seq. (West 2009).   NeLMA further asserts
Jackson's deceptive practices were willful and knowing, entitling
it to the full panoply of damages available under the CPA.
Jackson argues NeLMA's CPA claims are merely a restatement of its
Lanham Act claims and therefore should be summarily denied for
the same reasons its Lanham Act claims should be, or at least
genuine issues of material fact preclude a decision at this time.
Jackson also argues that he cannot be held individually liable
because the facts do not justify applying the corporate veil

18

piercing doctrine, citing <u>Unit Owners Ass'n of Summit Vista Lot 8</u>
<u>Condo. v. Miller</u>, 141 N.H. 39, 677 A.2d 138 (1996).  Plaintiff
counters that <u>Unit Owners</u> dictates the corporate veil of Northern
States in fact can be pierced to hold Jackson personally liable,
but also that Jackson should be held directly liable for
violating the CPA.

Two issues may be quickly resolved.  First, since default
judgment has been entered against Northern States, <u>see</u> section 3,
<u>supra</u>, it is liable on the CPA claims against it.  Second, the
doctrine of piercing the corporate veil is inapposite here.  The
CPA applies to individuals, enabling NeLMA to assert its claims
directly against Jackson.  <u>See</u> RSA 358-A:1, I (defining "Person"
to include natural persons in addition to various business
entities); <u>see also</u> <u>Unit Owners Ass'n</u>, 141 N.H. at 44, 677 A.2d
at 141 (emphasizing that the person liable under the CPA is the
unlawful actor); <u>Pacamor Bearings v. Minebea Co.</u>, 918 F. Supp.
491, 499 (D.N.H. 1996) (citing precedent for allowing "both
natural persons and corporations [to] avail themselves of the
protections and remedies afforded by the [CPA].").  Plaintiff did
not plead that Northern States' veil should be pierced in order
to reach Jackson, and it correctly argues now that Jackson' CPA

19

liability does not depend on the doctrine.  See <u>Bartholomew v.</u>
<u>Delahaye Group, Inc.</u>, Civ. No. 95-20-B, 1995 WL 907897, *10
(D.N.H. Nov. 8, 1995) (piercing the corporate veil pled as a
separate count); <u>see</u> <u>also</u> <u>Druding v. Allen</u>, 122 N.H. 823, 827,
451 A.2d 390, 393 (1982) (requiring a distinct claim be asserted
for piercing the corporate veil).[7]

There is no question that the CPA applies to the instant
matter, and that Jackson violated its provisions.  The CPA is "'a
comprehensive statute whose language indicates that it should be
given broad sweep.'"  <u>Pacamor Bearings</u>, 918 F.Supp. at 499
(quoting <u>Roberts v. Gen. Motors Corp.</u>, 138 N.H. 532, 538, 643
A.2d 956, 960 (1994)).  The CPA makes it "unlawful for any person

---

[7]Plaintiff's CPA claims against Jackson depend on his
personal unauthorized use of Index Packaging's NeLMA stamp and
not some misuse of the corporate form that might justify piercing
the corporate veil.  See e.g. <u>Druding</u>, 122 N.H. at 827, 451 A.2d
at 393 (finding individual not liable under veil piercing
doctrine where he "neither suppressed the fact of incorporation
nor misled the plaintiffs as to the corporate assets" to use *the
corporate form* to promote an injustice); <u>Unit Owners Ass'n</u>, 141
N.H. at 44, 677 A.2d at 141 (declining to impose individual
liability for acts of the corporate entity where corporate veil
cannot be pierced); <u>cf.</u> <u>Bartholomew</u>, 1995 WL 907897 at *11
(describing when the comingling of assets, concealing the fact of
incorporation and misleading creditors as to corporate assets can
justify piercing the corporate veil to reach individuals); <u>Alman</u>
<u>v. Danin</u>, 801 F.2d 1, 3-4 (1st Cir. 1986) (allowing corporate
veil to be pierced to reach individual owners' assets to enforce
a pension plan that unfunded, shell corporation fraudulently
negotiated).

to use any unfair method of competition or any unfair or

deceptive act or practice in the conduct of any trade or commerce

within this state" which includes, but is not limited to:

> I.   Passing off goods or services of those
>       of another;
>
> II.  Causing likelihood of confusion or of
>      misunderstanding as to the source,
>      sponsorship, approval, or certification
>      of goods or services;
>
> III. Causing likelihood of confusion or of
>      misunderstanding as to affiliation, connection
>      or association with, or certification by,
>      another; . . .
>
> V.   Representing that goods or services have
>      sponsorship, approval, [or] characteristics . . .
>      that they do not have; . . .
>
> VII. Representing that goods or services are of
>      a particular standard, quality, or grade . . .
>      if they are of another; . . ..

RSA 358-A:2 (describing unlawful acts).  If a business practice

is not enumerated in the statute, it still is considered "unfair"

if "(1) it is within at least the penumbra of some common-law,

statutory, *or other established concept of unfairness*, (2) it is

immoral, unethical, oppressive, or unscrupulous, or (3) it causes

substantial injury to consumers."  Pacamor Bearings, 918 F. Supp.

at 499 (internal quotations omitted, emphasis in original); see

also Becksted v. Nadeau, 155 N.H. 615, 619, 926 A.2d 819, 822-23

21

(2007) (looking to the Federal Trade Commission Act standard for
guidance to determine unfair business practice).  By its plain
language, the scope of unlawful activity covered by the CPA is
broader than the trademark infringement claims governed by the
Lanham Act which plaintiff asserts here.

The undisputed record establishes that Jackson deliberately
stamped pallets without any agreement or authorization from
either Index Packaging or NeLMA.  Jackson admitted he did this
before business hours to prevent other people at Northern States
from knowing that he was misusing the stamp.  He further admitted
that he allowed the mismarked pallets to be sold in his normal
business operations through Northern States.  While Northern
States was the conduit through which Jackson's mislabeled goods
got into the stream of commerce, nothing in the current record
indicates the corporate entity was a sham which Jackson used to
promote an injustice or fraud.  Instead, the record establishes
that Jackson was personally responsible for mislabeling the
pallets to represent they were of a quality or standard which he
knew was not true and for which he had not paid.

Regardless of what the scope of NeLMA's marks are, see
discussion supra, section 4, by Jackson's own admission he used

22

Index Packaging's stamp to pass off his pallets as having some type of approval, certification, quality or other competitive and economic advantage that the pallets in fact did not have.  This conduct, which persisted for nearly three years and only stopped after NeLMA discovered what Jackson was doing, unquestionably demonstrates an unfair business practice that unscrupulously sought to exploit the fortuitous misplacement of the Index Packaging-NeLMA stamp to profit his business.  Jackson directly violated the CPA by personally stamping the WPM and moving the mismarked pallets into Northern State's inventory.  Plaintiff's motion for summary judgment on Count III is granted with respect to Jackson's liability for violating the CPA.

Based on the current record, however, the issue of damages cannot be resolved.  Plaintiff has not proffered any evidence that demonstrates the financial ramifications of these CPA violations, and genuine issues of material fact preclude a finding whether statutory damages rather than actual damages are appropriate.  See RSA 358-A:10 (providing damages calculations for private CPA actions).  Accordingly, plaintiff's motion for summary judgment with respect to damages, fees and costs is denied.

23

Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment (document no. 38) is disposed of as follows:

Counts I and II - denied with respect to both liability and damages;

Count III - granted with respect to Jackson's liability but denied with respect to damages.

**SO ORDERED.**


James R. Muirhead
United States Magistrate Judge


Date:  May 5, 2010

cc:    George F. Burns, Esq.
       Dawnangela Minton, Esq.
       James H. Jackson, pro se

24