UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Northeastern Lumber Manufacturers
Association

    v.                                 Civil No. 09-cv-290-LM

Northern States Pallet Company,
Inc., et al.


**O R D E R**

The Northeastern Lumber Manufacturers Association ("NeLMA")
sued Northern States Pallet Company ("Northern States") and its
owner, James Jackson, in seven counts, seeking relief under the
Lanham Act (Counts I and II), the New Hampshire Consumer
Protection Act (Count III), the New Hampshire Trademark Act
(Count IV), and the New Hampshire common law of
misrepresentation (Count V), negligence (Count VI), and
conversion (Count VII).  NeLMA's claims arise out of defendants'
unauthorized use of a misappropriated NeLMA certification stamp
to identify wood pallets it sold as complying with certain
international inspection standards when, in fact, the pallets
were noncompliant.

Plaintiff's action against Jackson was stayed due to Jackson's bankruptcy filing.  See doc. no. 58.  Jackson has since received a discharge.  See doc. no. 67.

On October 21, 2010, the court granted NeLMA a default judgment as to liability on all counts against Northern States. See doc. no. 61.  Before the court for determination is the correct measure of relief due to NeLMA.  NeLMA has submitted a memorandum of law, doc. no. 65, and a proposed order, doc. no. 65-1.  Northern States, which was defaulted for failing to secure substitute counsel after the withdrawal of its original counsel, has filed no objection.  The court held a hearing on damages on December 13, 2010.

## Background

"A defaulting party 'is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated.'" Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62-63 (1st Cir. 2002) (quoting Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999)).  Accordingly, the following facts are drawn from NeLMA's First Amended Complaint, doc. no. 39.

NeLMA is a trade association that serves as a certifying agency for lumber, timber, and wood packaging materials under the aegis of the American Lumber Standards Committee.  NeLMA

owns two federally registered trademarks which it uses for, among other things, certifying compliance with an international inspection program known as the Wood Packaging Materials Inspection Program.  That program requires wood to be heat treated.  Heat treating, in turn, kills various harmful pests that, without heat treatment or chemical fumigation, could travel in wood products, at considerable risk to timberlands in the countries to which those products are shipped.  Application of NeLMA's mark, by way of a stamp, indicates that the wood so stamped has been heat treated.

Northern States, which appears to have gone out of business, once manufactured and sold wooden pallets.  The Company's president, James Jackson, acquired a NeLMA stamp that NeLMA had issued to another wood-products company, Index. Without the knowledge or consent of either NeLMA or Index, Jackson used Index's NeLMA stamp to mark some of Northern States' pallets, but not all of them, as having been heat-treated when they were not.

The conduct described above took place from approximately the beginning of 2007 through the middle of 2009.  Defendant sold 14,000 mismarked pallets to nine customers over the course of approximately 500 transactions.  The gross revenue from those sales was $158,030.50.  Jackson Dep. (Oct. 13, 2009), doc. no. 65-2, at 52.  On sales such as the ones at issue here, Northern

States' gross profit was twenty to twenty-five percent, and its net profit was approximately five percent.  Id.

From the outset, Jackson knew that he was not authorized to use Index's NeLMA stamp, and that it was wrong for him to do so. At some point in the summer of 2009, Jackson returned the stamp to Index and shortly thereafter, Northern States exhausted its inventory of mismarked pallets.

After NeLMA learned of Northern States' unlawful use of Index's stamp, four of NeLMA's employees expended a total of 288 hours, at a cost of $9,660, to minimize the damages caused by Northern States' use of the stamp.  Easterling & Moore Decl., doc. no. 65-4, ¶ 3.  According to their declaration, NeLMA's president, Jeff Easterling, and its chief inspector, Marc Moore, "believe NeLMA has suffered damages in the amount of at least $100,000."  Id.  Their belief, however, is not more specifically quantified or otherwise supported.

Based on the foregoing, NeLMA asserted claims under the Lanham Act, the New Hampshire Consumer Protection Act, the New Hampshire Trademark Act, and New Hampshire common law.  As noted, NeLMA has been awarded default judgment against Northern States on all counts.

**Discussion**

NeLMA now seeks both equitable and monetary relief.  As detailed in its proposed order, the requested equitable relief includes: (1) a permanent injunction against Northern States' further use of NeLMA's marks; (2) an order requiring Northern States to indicate, under oath, how it has complied with the permanent injunction; (3) seizure of various materials from Northern States; and (4) destruction of infringing articles in Northern States' possession.  NeLMA also seeks compensation in the amount of at least $1,032,122 (plus interest), $1,962.19 in costs, and $93,256.80 in attorneys' fees.

A. Equitable Relief

In this section, the court considers each of the four categories of equitable relief that NeLMA requests.  As a preliminary matter, the court notes that NeLMA's requests for equitable relief, while stated in its proposed order, are not discussed in the memorandum of law devoted to damages, doc. no. 65, and those requests remained unaddressed at the hearing on damages.

1. Permanent Injunction

NeLMA asks the court to enjoin Northern States and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Northern States

who receive actual notice of the court's order by personal

service or otherwise (hereinafter "privies") from the following:

    a.    Using any Northeastern Lumber Manufacturers
          Association ("NeLMA") marks or any confusingly
          similar mark, specifically including, but not
          limited to, any term that includes "NeLMA" or a
          misspelling of NeLMA in connection with the
          promotion, marketing, advertising, public
          relations and/or operation of Northern States'
          business;

    b.    Diluting, blurring, passing off or falsely
          designating the origin of NeLMA's marks, and from
          injuring NeLMA's goodwill and reputation;

    c.    Doing any other act or thing likely to induce the
          believe that Northern State's businesses,
          services, or product are in any way connected
          with, sponsored, affiliated, licensed or endorsed
          by NeLMA;

    d.    Using any of the NeLMA marks or any confusingly
          similar mark for goods and services, or on the
          Internet, or as domain names, email addresses,
          meta tags, invisible data, or otherwise engaging
          in acts or conduct that would cause confusion as
          to the source, sponsorship or affiliation of
          Northern States with NeLMA.

Doc. no. 65-1, at 2.

"The several courts vested with jurisdiction of civil

actions arising under [the Lanham Act] shall have power to grant

injunctions, according to the principles of equity and upon such

terms as the court may deem reasonable, to prevent the violation

of any right of the registrant of a mark registered in the

Patent and Trademark Office . . . ."  15 U.S.C. § 1116(a).

Indeed, "[a]n injunction is the usual and standard remedy once

trademark infringement has been found."  5 J. Thomas McCarthy,

McCarthy on Trademarks and Unfair Competition § 30:1, at 30-5

(4th ed. 2010).

> A plaintiff seeking a permanent injunction before
> a district court must ordinarily show: "(1) that it
> has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that,
> considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not
> be disserved by a permanent injunction."

Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc., 605

F.3d 10, 19 (1st Cir. 2010) (quoting eBay Inc. v. MercExchange,

L.L.C., 547 U.S. 388, 391 (2006); citing CoxCom, Inc. v.

Chaffee, 536 F.3d 101, 112 (1st Cir. 2008)).

### a. Irreparable Injury and Inadequate Relief

"The first two of the four factors [for permanent

injunctive relief] are satisfied on a showing of 'substantial

injury that is not accurately measurable or adequately

compensable by money damages.'" CoxCom, 536 F.3d at 112

(quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217

F.3d 8, 13 (1st Cir. 2000)).

In trademark infringement cases, "[i]njury is presumed

because if confusion is likely, it is also probable that the

senior user's reputation is placed in the hands of another – the

junior user."  5 McCarthy, supra, § 30:2, at 30-10 (citations

omitted).  As McCarthy explains, "[i]t is notoriously difficult

for the owner of a trademark to prove measurable damage caused

by acts of infringement." Id. § 30:2, at 30-11.  Regarding the adequacy of money damages, McCarthy teaches that "[i]f a defendant has been found to be committing acts which constitute unfair competition, there seems little doubt that money damages are 'inadequate' to compensate plaintiff for continuing acts of the defendant." Id. § 30:2, at 30-7.

Here, the court concludes that Northern States has irreparably harmed NeLMA's goodwill by placing untreated pallets into the stream of commerce with false certifications and that the injury Northern States has inflicted is not adequately compensable by money damages.

### b. Balance of Hardships and Public Interest

The third and fourth factors each weigh heavily in NeLMA's favor.  Without an injunction, NeLMA would face the prospect of continued infringement and/or counterfeiting of its marks, and the subsequent erosion of its goodwill.  Northern States' hardship is more difficult to discern.  Theoretically, Northern States could face hardship if the company happened to be sitting on a large stock of falsely marked but still unsold pallets, but the only evidence in the record on this point suggests that Northern States is neither in business nor in possession of any more mismarked pallets.  The only established hardship and, necessarily, the weightiest, is the hardship falling on NeLMA.  So, too, with the public interest.  Given the importance of

8

trustworthy certification stamps on wooden products in international trade, the court cannot imagine a way in which the public interest would be disserved by enjoining Northern States and its privies from any further trademark infringement or counterfeiting.

### c. Scope of the Injunction

Having determined that injunctive relief is an appropriate remedy in this case, all that remains is to assess the scope of the injunction.  "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs."  Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 40 (1st Cir. 2002) (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)).  Accordingly, "courts must 'closely tailor injunctions to the harm that they address.'"  Tamko, 282 F.3d at 40 (quoting ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 972 (D.C. Cir. 1990)).  Here, the proposed injunction does nothing more than prohibit conduct that is unlawful under the Lanham Act.  That is a perfectly appropriate burden to place on Northern States and its privies.

Because the requirements for permanent injunctive relief have been met, and the injunction NeLMA seeks is appropriate in scope, NeLMA's request for injunctive relief, as specified in document number 65-1 and above, is granted in full.

### 2. Proof of Compliance

NeLMA asks the court to order Northern States to make a report in writing and under oath, within thirty days of service of the permanent injunction, setting forth the manner and form in which it has complied with the permanent injunction.  Under the Lanham Act, any injunction issued by the court "may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction . . . a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction."  15 U.S.C. § 1116(a).  Because the injunction in this case is purely prohibitory, rather than one that "require[s] defendant to take affirmative steps to distinguish its products so as to indicate their real source to the public," 5 McCarthy, supra, § 30:5, at 30-19, it is entirely unclear how, exactly, Northern States could document its compliance.  Accordingly, and in the interest of not mandating a hollow exercise that would have no practical purpose other than exposing Northern States to liability for contempt, the court declines to order Northern States to document its compliance with the injunction in this case.

### 3. Seizure of Goods

NeLMA asks the court to order that "all counterfeit marks and all goods or documents or other things bearing such marks be

seized, together with the means of making such marks, and records demonstrating the manufacture, sale, or receipt of things involved in such violation." Doc. no. 65-1, at 1. 15 U.S.C. § 1116(d)(1)(A) provides "for the seizure of goods and counterfeit marks involved in . . . violation [of § 1114(1)(a) or 36 U.S.C. § 220506] and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation." But, the seizure of goods and other materials described in § 1116(d) is in the nature of a pre-trial temporary restraining order, not a post-judgment remedy. See 5 McCarthy, supra, §§ 30:34-44; Vuitton v. White, 945 F.2d 569, 571-74 (3d Cir. 1991). For that reason, and because NeLMA has not proffered evidence sufficient to support the findings required by § 1116(d), NeLMA is not entitled to the seizure order it seeks.

## 4. Destruction of Infringing Articles

Finally, NeLMA asks the court to order that "all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Northern States, bearing Northern State[s'] confusingly similar mark, be delivered up and destroyed." Doc. no. 65-1, at 3. 15 U.S.C. § 1118 authorizes the issuance of such orders. Presumably, NeLMA seeks the destruction of any wooden pallets in Northern States' possession on which NeLMA's marks have been stamped. But, rather than

specifically identifying the articles it seeks to have delivered up and destroyed, NeLMA simply repeats the words of the statute, which would make it difficult to draft a sufficiently precise destruction order.  Moreover, the record strongly suggests that Northern States, now a defunct entity, has nothing in its possession that would be subject to destruction under the statute.

While destruction orders are contemplated by the statute, where, as here, defendant has been enjoined "from further infringement, the rights of the plaintiff are adequately protected and an order requiring destruction of infringing articles, though permitted, may be unnecessary." Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc., 589 F. Supp. 2d 25, 33 (D.D.C. 2008) (quoting Kelley Blue Book v. Car-Smarts, Inc., 802 F. Supp. 278, 293 (C.D. Cal. 1992); citing Neva, Inc. v. Christian Duplications Int'l, Inc., 743 F. Supp. 1533, 1549 (M.D. Fla. 1990); Bonanza Int'l, Inc. v. Double "B", 331 F. Supp. 694, 697 (D. Minn. 1971)).  Because plaintiff is protected against future infringement by the injunction described above, the court declines to issue the destruction order NeLMA seeks. See 15 U.S.C. § 1118 ("the court may order . . .") (emphasis added); Frostie Co. v. Dr. Pepper Co., 361 F.2d 124, 127 (5th Cir. 1966) (noting that scope of equitable relief in Lanham Act cases is within the discretion of the trial court).

B. Monetary Relief

NeLMA seeks compensation of at least $1,032,122 plus interest, $1,962.18 in costs, and $93,265.80 in attorneys' fees. In its proposed order, doc. no. 65-1, NeLMA seeks defendant's profits (pursuant to 15 U.S.C. § 1117(a)(1)), its own actual damages (pursuant to 15 U.S.C. § 1117(a)(2) and/or N.H. Rev. Stat. Ann. ("RSA") § 358-A:10), treble damages (pursuant to 15 U.S.C. § 1117(b) and/or RSA 358-A:10), and attorneys' fees (pursuant to RSA 358-A:10 and/or 15 U.S.C. § 1117(a) and (b)).[1] In its memorandum, NeLMA discusses only the remedies available under the Lanham Act and the New Hampshire Consumer Protection Act ("CPA"), RSA 358-A.  NeLMA further suggests that the court needs to assess monetary relief under its other theories of liability "only to the extent [its] primary theories [i.e., the Lanham Act and the New Hampshire CPA] fail to enable the court to award the full relief [it] deserves."  Doc. no. 65, at 3.

Regardless of the cause(s) of action under which monetary relief is awarded, NeLMA is obligated to prove the damages it

---

[1] NeLMA's memorandum also includes a lengthy section devoted to statutory damages under the Lanham Act.  Doc. no. 65, at 7-12.  In its memorandum, NeLMA correctly notes that it has the right to "elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits . . . an award of statutory damages."  15 U.S.C. § 1117(c).  While NeLMA points out its right to elect statutory damages, neither its memorandum nor its proposed order give any indication that NeLMA has actually made such an election.  Thus, there is no need to give any further consideration to statutory damages.

seeks.  See Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 339
n.3 (1st Cir. 2008) (citations omitted); KPS & Assocs., Inc. v.
Designs by FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003) (citing
Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) ("While a
default judgment constitutes an admission of liability, the
quantum of damages remains to be established by proof unless the
amount is liquidated or susceptible of mathematical
computation.") (citations omitted)).

### 1. Lanham Act

NeLMA has been granted default judgment on a variety of
Lanham Act claims.  In Count I, NeLMA charged defendants with
infringement, in violation of 15 U.S.C. § 1114, and with
counterfeiting, in violation of §§ 1114 and 1116(d).  In Count
II, NeLMA charged defendants with false designation of origin
and passing off, in violation of 15 U.S.C. § 1125(a).  NeLMA
asserts that the conduct underlying both Counts I and II was
deliberate, willful, and wanton, thus making this an exceptional
case for purposes of the attorney's fees provision in 15 U.S.C.
§ 1117(a).

The Lanham Act provides several different monetary
remedies.  For most violations, those remedies include: "(1)
defendant's profits, (2) any damages sustained by the plaintiff,

and (3) the costs of the action."  15 U.S.C. § 1117(a).[2]
Moreover, "[t]he court in exceptional cases may award reasonable
attorney fees to the prevailing party."  Id.  In certain
situations, when a defendant is liable for using a counterfeit
mark in violation of 15 U.S.C. § 1114(1)(a) or 36 U.S.C. §
220506, "the court shall, unless the court finds extenuating
circumstances, enter judgment for three times such profits or
damages, whichever amount is greater, together with a reasonable
attorney's fee."  15 U.S.C. § 1117(b).

### a. Defendants' Profits and Plaintiff's Damages

NeLMA seeks $1,032,122 in compensation, exclusive of costs
and attorneys' fees.  To establish that amount, NeLMA added the
gross revenue Jackson attributed to the sale of mismarked
pallets, $158,030.50, to the $100,000 in actual damages claimed
by Easterling and Moore, and then added that sum, $258,030.50,
to three times that sum, i.e., $774,091.50, to reach a grand
total of $1,032,122.  As explained below, NeLMA is entitled to
an award of $128,182.87 under the Lanham Act.

When assessing the profits earned by a trademark infringer,
"the plaintiff shall be required to prove defendant's sales

---

[2] The First Circuit has yet to decide whether "'willfulness'
is required as a foundation for . . . an award" of defendants
profits under the Lanham Act.  Venture Tape Corp. v. McGills
Glass Warehouse, 540 F.3d 56, 63 (1st Cir. 2008) (citing Tamko,
282 F.3d at 36).  Here, however, as in Venture Tape, 540 F.3d at
63, the court need not decide the issue, because the complaint
and the record both establish Northern States' willfulness.

only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Here, the evidence is that NeLMA earned $158,030.50 from the sale of mismarked pallets. Jackson's deposition testimony also establishes that Northern States made a gross profit of twenty to twenty-five percent on its sales. Thus, Northern States' profits on sales of mismarked pallets amount to $39,507.62, which is twenty-five percent of $158,030.50. NeLMA's adequately supported damages total $9,660, which is what NeLMA paid in wages to employees tasked with limiting the fallout from Northern States' unlawful activity. While Easterling and Moore testified that they believed NeLMA suffered another $90,000 or so in damages, there is nothing in their declaration that would allow the court to treat that testimony as anything more than speculation of a sort that is insufficient to support an award of damages. See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 19 (1st Cir. 2009) (citing Nestle Food Co. v. Miller, 836 F. Supp. 69, 78 (D.R.I. 1993), for the "enduring rule that damages must be established by a reasonable certainty and may not be recovered if purely speculative").

### b. Treble Damages

Having established that NeLMA is entitled to defendant's profits of $39,507.62 plus $9,660 in actual damages, the court

turns to NeLMA's request for treble damages.  The Lanham Act

provides, in pertinent part:

> In assessing damages under subsection (a) for any
> violation of section 1114(1)(a) of this title . . . a
> case involving use of a counterfeit mark or
> designation (as defined in section 1116(d) of this
> title), the court shall, unless the court finds
> extenuating circumstances, enter judgment for three
> times such profits or damages, <u>whichever amount is
> greater</u>, together with a reasonable attorney's fee, if
> the violation consists of
>
> > **(1)** intentionally using a mark or
> > designation, knowing such mark or designation is
> > a counterfeit mark (as defined in section 1116(d)
> > of this title), in connection with the sale,
> > offering for sale, or distribution of goods or
> > services; or
> >
> > . . . .
>
> In such a case, the court may award prejudgment
> interest on such amount at an annual interest rate
> established under section 6621(a)(2) of Title 26,
> beginning on the date of the service of the claimant's
> pleadings setting forth the claim for such entry of
> judgment and ending on the date such entry is made, or
> for such shorter time as the court considers
> appropriate.

15 U.S.C. § 1117(b) (emphasis added).

Here, NeLMA has been granted judgment against Northern

States on a violation of 15 U.S.C. § 1114(1)(a) involving the

use of a counterfeit mark or designation.  Because the court can

discern no extenuating circumstances, and Jackson's deposition

testimony establishes that Northern States' violation was

intentional and knowing, NeLMA is entitled to "three times

[defendant's] profits or [plaintiff's] damages, whichever amount

is greater."  Id.  Accordingly, NeLMA's total monetary award under the Lanham Act, exclusive of costs and attorney's fees, comes to $128,182.87 ($39,507.62 times three, plus $9,660). NeLMA is also entitled to prejudgment interest on its $118,522.87 in treble damages.  See 15 U.S.C. § 1117(b).

### c. Costs

NeLMA is also entitled to its costs, which amount to $1,962.18.  See Burns Decl., doc. no. 65-3 ¶¶ 5-6.

### d. Attorneys' Fees

Finally, NeLMA seeks attorneys' fees under 15 U.S.C. §§ 1117(a) and (b).  For the same reasons that support an award of treble damages, NeLMA is entitled to its attorneys' fees under § 1117(b).  Attorneys' fees would also be appropriate under § 1117(a), which provides that the court may award the prevailing party reasonable attorney's fees in "exceptional cases." Jackson's unlawful use of NeLMA's stamp was, by his own testimony, willful.  In addition, the court has little difficulty concluding that this is an "exceptional" case, given the potentially dire consequence that could result from sending a falsely marked insect-infested pallet into the stream of international commerce.  See Tamko, 282 F.3d at 32 ("Willfulness short of bad faith or fraud will suffice when equitable

considerations justify an award and the district court supportably finds the case exceptional.").

Having determined that an award of attorneys' fees under the Lanham Act is justified in this case, the only remaining question is the amount of the award.  As with the profits and damages the court has awarded to NeLMA, Northern States' failure to oppose NeLMA's request for attorneys' fees does not relieve NeLMA of its obligation to prove the amount of fees to which it is entitled, nor does it relieve the court of its obligation to scrutinize NeLMA's request for fees, so that it can make an award that is fair and lawful.

When determining the amount of an award of attorneys' fees, "[n]ormally, a district court begins with a lodestar analysis." De Jesús Nazario v. Morris Rodríguez, 554 F.3d 196, 207 (1st Cir. 2009).

> The "lodestar method" of calculating attorneys' fees awards requires the district judge to multiply the number of hours productively expended by counsel by a reasonable hourly rate.  See De Jesus Nazario v. Morris Rodriguez, 554 F.3d 196, 207 (1st Cir. 2009). The resulting amount is presumptively reasonable, Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992), although the district court enjoys some discretion to adjust the lodestar amount upwards or downwards, see De Jesus Nazario, 554 F.3d at 207.

Burke v. McDonald, 572 F.3d 51, 56 (1st Cir. 2009).  "When the district court arrives at the lodestar and completes its consideration of possible adjustments, it ought to provide a 'concise but clear' explanation of its calculation of the

resultant fee award." Torres-Rivera, 524 F.3d at 337 (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)).

**Number of hours**. "The party claiming attorneys' fees bears the burden of proving the reasonableness of the hours it claims." Burke, 572 F.3d at 63 (1st Cir. 2009) (citation omitted). "In crafting its lodestar, the trial court may adjust the hours claimed to remove time that was unreasonably, unnecessarily or inefficiently devoted to the case." De Jesús Nazario, 554 F.3d at 207 (citation omitted).

NeLMA has provided the court with relatively detailed billing records[3] that contain more than the kind of "gauzy generalities" that the First Circuit says should be "substantially discounted." Burke, 572 F.3d at 63 (quoting Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992)). Based on those records, it is a relatively straightforward matter to identify certain fees that were related to work on causes of action other than NeLMA's claims under the Lanham Act. Obviously, the Lanham Act's attorney's fees provisions provide no basis for awarding fees for NeLMA's state-law claims. See Phetosomphone v. Allison Reed Group, Inc., 984 F.2d 4, 7 (1st

---

[3] While adequate, those records are not perfect. They do contain some generalities, such as four hours, at $355 per hour, for "[w]ork on motions" on September 1, 2009, Burns Decl., Ex. A, doc. no. 65-3, at 8, and 4.6 hours, at $355 per hour, for "[w]ork on pleadings" two days later, id. at 9. There is also a fair amount of "block billing," see Torres-Rivera, 524 F.3d at 340 (affirming district court's reduction of hours where counsel used block billing).

Cir. 1993) (affirming district court's segregation of fees spent to prosecute state-law claims from fee award under Title VII). But, because NeLMA is entitled to attorneys' fees on its New Hampshire CPA claim, for reasons given below, the only fees to which NeLMA is not entitled are those associated with its state common-law claims.

Specifically, the court eliminates the following fees from its lodestar calculation: two hours of the George Burns billing for August 24, 2009, for researching New Hampshire causes of action ($710); one hour of the Burns billing for October 7, 2009, for researching the New Hampshire trademark statute ($355) the Dawnangela Minton billing for October 7, 2009, for researching damages under state law ($378); thirty minutes of the Burns billing for October 8, 2009, for discussing amendments to the complaint with Minton ($177.50); one hour of the Minton billing for October 20, 2009, for research on punitive or enhanced compensatory damages ($180); the Eben Albert-Knopp billing for November 2, 2009, for reviewing hearing transcript in preparation for amending the complaint ($518); the Albert-Knopp billing for November 3, 2009, for amending the complaint to include claims for misrepresentation, negligence, and conversion ($364); the Burns billing for November 3, 2009, for working with the amended complaint ($35.50); the Burns billing for November 9, 2009, for reviewing the amended complaint

($142); the Albert-Knopp billing for November 12, 2009, for
revising the amended complaint and drafting a motion for leave
to file the amended complaint ($308); one and a half hours of
the Burns billing for November 30, 2009, for finalizing the
amended complaint ($532.50); the Minton billing for November 30,
2009, for discussing state-law damages with Burns ($54); the
Minton billing for December 1, 2009, for working on state-law
damages ($270); the Albert-Knopp billing for December 1, 2009,
for filing a motion for leave to amend the complaint and the
amended complaint ($42); one and a half hours of the Minton
billing for December 11, 2009, for researching state issues for
drafting pleadings ($270); the Minton billing for December 15,
2009, for reading the objection to the motion to amend ($54);
fifteen minutes of the Burns billing for December 16, 2009, for
reviewing Minton's damages memo ($88.75); and the Burns billing
for January 7, 2010, for reviewing the court order granting the
motion to amend ($72.00).  In total, $4,549.25 of NeLMA's
attorneys' fees was expended to pursue causes of action which do
not provide for an award of attorneys' fees and, as a result,
must be eliminated from the lodestar.  See Burke, 572 F.3d at
65.

     **Reasonable hourly rate.**  "Reasonable hourly rates will vary
depending on the nature of the work, the locality in which it is
performed, the qualifications of the lawyers, and other

criteria." United States v. One Star Class Sloop Sailboat Built
in 1930 With Hull Number 721, Named "Flash II", 546 F.3d 26, 38
(1st Cir. 2008) (citing Gay Officers Action League v. Puerto
Rico, 247 F.3d 288, 295 (1st Cir. 2001); United States v. Metro.
Dist. Comm'n, 847 F.2d 12, 19-20 (1st Cir. 1988)).  More
specifically, a reasonable hourly rate is to be determined
"'according to the prevailing market rates in the relevant
community,' that is 'those prevailing in the community for
similar services by lawyers of reasonably comparable skill,
experience and reputation.'" Grendel's Den, Inc. v. Larkin, 749
F.2d 945, 955 (1st Cir. 1984) (quoting Blum v. Stenson, 465 U.S.
886, 895 & n.11 (1984)).  "[T]he court may take guidance from,
but is not bound by, an attorney's standard billing rate." Gay
Officers, 247 F.3d at 296 (citing Brewster v. Dukakis, 3 F.3d
488, 492-93 (1st Cir. 1993)).

        The court has two concerns with the hourly rates NeLMA used
to calculate the lodestar in this case.  The first relates to
the evidence supporting those rates, which consists of nothing
more than Attorney Burns' statement that he "believe[s] that the
rates charged are comparable with charges by other firms in this
community for similar legal work." Burns Decl. ¶ 4.  That is
insufficient.  As the Supreme Court has explained:

        In seeking some basis for a [market rate for the
        services of a lawyer], courts properly have required
        prevailing attorneys to justify the reasonableness of
        the requested rate or rates.  To inform and assist the

> court in the exercise of its discretion, the burden is
> on the fee applicant to produce satisfactory evidence
> – in addition to the attorney's own affidavits – that
> the requested rates are in line with those prevailing
> in the community for similar services by lawyers of
> reasonably comparable skill, experience and
> reputation.

Blum, 465 U.S. at 896 (emphasis added).  Before the court can

make a supportable award of attorneys' fees, it must have

documentation of the qualifications of each of the eighteen

attorneys and paralegals whose fees NeLMA seeks to recover[4] and,

in addition, independent evidence that the hourly rates charged

by those attorneys and paralegals are in line with those

prevailing in the local community.  With regard to the

prevailing rates in this community, the court directs NeLMA's

attention to Judge Laplante's order in Frost v. Town of Hampton,

No. 09-cv-339-JL, 2010 WL 1667290, at *5 & n.5 (D.N.H. Apr. 23,

2010), which collects cases documenting the hourly rates that

have been used to calculate awards of attorneys' fees in this

district over the last decade.

---

[4] The court also harbors concerns about overstaffing, given
that seven different attorneys, billing at least $140 per hour,
each spent more than sixteen hours on this case.  See One Star
Class Sloop, 546 F.3d at 43 ("overstaffing is a familiar problem
in cases in which fee-shifting is in prospect") (citing Pearson
v. Fair, 980 F.2d 37, 47 (1st Cir. 1992); Metro. Dist. Comm'n,
847 F.2d at 18-19; Grendel's Den, 749 F.2d at 953); see also Gay
Officers, 247 F.3d at 297-98.  The court wishes to emphasize
that it has not determined that this case has been overstaffed
but, rather, suggests that plaintiff should address that issue,
through the same witness it engages to validate the hourly rates
of the attorneys and paralegals whose work has been invoiced, so
that the court can make a supportable award of fees.

24

The court's second concern relates to the fees attributable to the work of Attorney Burns, who has the highest billing rate of any of the Bernstein Shur attorneys who have worked on the case – a rate that is at the far upper end of the spectrum described in Frost. Specifically, the court notes that Attorney Burns billed nearly twice as many hours as the next highest billing attorney, that his hours account for more than forty-one percent of all the time expended on the case, and that his fees account for more than fifty-eight percent of the fees charged to NeLMA. That billing profile, which resembles an upside down pyramid, raises concerns that some of the legal work in this case performed by senior attorneys did not require the experience and skill of a senior attorney to be performed properly. If that is the case, then the hourly rates for any such work may need to be adjusted downward. See O'Rourke v. City of Providence, 235 F.3d 713, 737 (1st Cir. 2001) (affirming reduction in an attorney's billing rate because the attorney, a partner, assumed "the role of an associate" by performing less complex tasks at trial); see also Bogan v. City of Boston, 489 F.3d 417, 429 (1st Cir. 2007) (affirming magistrate judge's reduction of senior attorney's billing rate, based on nature of attorney's participation in the case). Given the court's concerns over the top-heavy billing profile in this case, and its review of the billing records, NeLMA must present evidence

to support the billing rate applied to the work performed by
Attorney Burns.  See Miles v. Sampson, 675 F.2d 5, 9 (1st Cir.
1982) (citing Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir.
1980), for the proposition that "calculating the 'lodestar'
. . . involves separating out work done in relation to a firm's
hierarchy . . . and . . . assigning appropriate hourly rates for
the kinds of work done by those at different levels of
expertise").[5]  That evidence could come from the same source
NeLMA engages to substantiate that the hourly rates charged by
its lawyers are consistent with those charged in the local
community.  As with the overstaffing issue, see footnote four,
supra, the court has not determined that there is anything amiss

---

[5] The Miles court continued by pointing out that "Copeland
makes clear that different hourly rates are appropriate when the
same attorney performs different kinds of work."  675 F.2d at 9
(citing Copeland v. Marshall, 641 F.2d 880, 892 (D.C. Cir.
1980)).  In Miles, the court of appeals affirmed the district
court's award of fees, when the district court

> applied a rate of $50 per hour for some services
> (e.g., court attendance, drafting of the consent
> decree), $25 per hour for others (e.g., certain legal
> research, a conference with a law student intern,
> preparation for a deposition), $20 for others (e.g.,
> certain telephone conferences, review of a motion) and
> $10 for others (e.g., other legal research, the
> drafting of interrogatories and various other papers,
> travel).

Miles, 675 F.2d at 9.  In this case, the billing records suggest
the possibility that, perhaps, some of Attorney Burns' time
might more properly be assigned an hourly rate less than $355 or
$360.  For example, the court notes billings for "call[ing]
Barbara Williams re safe custody of stamp," Burns Decl., Ex. A,
at 6, and "gather[ing] Dunn & Bradstreet report on Northern
States; distribut[ing] to client," id.

26

with Attorney Burns' billing; it simply seeks plaintiff's
assistance in collecting the evidence necessary to make a
supportable award of attorneys' fees which, of course,
ultimately inures to the benefit of plaintiffs and their
counsel.

**Apportionment.**  One final issue related to attorneys' fees
presents itself.  NeLMA is entitled to attorneys' fees from
Northern States, but Northern States is not the only defendant
in this case, and NeLMA has not prevailed over the other
defendant, James Jackson.  The First Circuit has held that where
a plaintiff has "prevailed over more than one defendant, the
court must take an additional step: it must determine whether
the fee award should run jointly and severally against the
defendants or, if not, what portion of the award each defendant
should bear."  Torres-Rivera, 524 F.3d at 337 (citation
omitted).  Here, too, it would seem that the court is obligated
to determine whether liability for attorneys' fees should run
jointly and severally or be apportioned between Northern States
and Jackson.  Accordingly, NeLMA is directed to brief this
issue.

2. Consumer Protection Act

Given NeLMA's entitlement to damages, costs, and attorneys'
fees under the Lanham Act, there is no need to discuss the
remedies available to NeLMA under the CPA, with one small

27

exception.   Under the treble-damages provision of the Lanham
Act, NeLMA is entitled to recover three times the amount of
Northern States' profits, but not three times its actual
damages.   See 15 U.S.C. § 1117(b).   Thus, the court turns to the
treble-damages provision of the CPA.

Under the CPA, "[i]f the court finds that the use of the
method of competition or the act or practice was a willful or
knowing violation of this chapter, it shall award as much as 3
times, but not less than 2 times, such amount."   RSA 358-A:10,
I.   NeLMA alleged willful conduct in its complaint, and
Jackson's deposition testimony establishes that Northern States'
conduct was willful.   Therefore, NeLMA is entitled to multiple
damages under the CPA.   Based upon the potentially disastrous
consequences of defendant's conduct, which go well beyond those
of a typical case of consumer deception, the court is satisfied
that triple damages, rather than double damages, are
appropriate.   Thus, the court awards NeLMA $27,908 for its
actual damages.

## Conclusion

Based on the foregoing, NeLMA is entitled to the following
relief: (1) an injunction, as described on page six; (2)
$118,522.87 in profits, plus prejudgment interest on that
amount, as provided for in 15 U.S.C. § 1117(b); (3) $27,908 in

28

actual damages; and (4) $1,962.18 in costs, plus any allowable costs incurred since that figure was calculated.

NeLMA is also entitled to an award of attorney's fees, in an amount yet to be determined.  To inform and assist the court in its determination of a fair and lawful fee award, NeLMA is directed to submit: (1) information documenting the qualifications of the various attorneys and paralegals whose fees it seeks to recover; (2) independent expert evidence on: (a) the fees charged in the local community by attorneys and paralegals with qualifications similar to those who litigated this case; (b) the level of experience necessary to perform the tasks for which Attorney Burns has billed NeLMA; and (c) the degree to which, if any, this litigation was overstaffed; and (3) a memorandum of law on the issue of apportionment.

**SO ORDERED.**

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  January 31, 2011

cc:  George F. Burns, Esq.
     Dawnangela A. Minton, Esq.
     James H. Jackson, pro se