**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Northeastern Lumber
Manufacturers Association

    v.                               Civil No. 09-cv-290-LM

Northern States Pallet Company,
Inc.; and James H. Jackson


## O R D E R

    Pending before the court for determination is the amount of attorneys' fees to which the Northeastern Lumber Manufacturers Association ("NeLMA") is entitled from defendant Northern States Pallet Company ("Northern States").  For the reasons that follow, NeLMA is entitled to an award of $37,500 in attorneys' fees and $1,962 in costs.


### Apportionment

    In its most recent order in this case, the court "defer[ed] taking any action on NeLMA's request for attorneys' fees until such time as NeLMA tells the court how it wishes to proceed with respect to [James] Jackson."  Order (doc. no. 70), at 4.  While NeLMA has not done so, it did submit a final judgment in its favor in an adversary proceeding in Jackson's bankruptcy case.

In that proceeding, NeLMA pressed claims against Jackson based on conduct identical to the conduct underlying NeLMA's claims against Northern States and Jackson in this case.  Jackson defaulted in the adversary proceeding, and NeLMA asked for a judgment "in an amount equal to all damages assessed by the United States District Court against either Jackson individually or Northern States . . . plus such attorney fees and costs ultimately assessed by the Unite[d] State District Court."  The Bankruptcy Court's final judgment provides:

> Judgment is hereby entered against DEFENDANT in the amount of $157,122.33, with interest thereon at the rate provided by statute and such attorneys fees as are awarded by the United States District Court in connection with this matter.

Pl.'s Second Resp., Ex. 1 (doc. no. 71-1).  NeLMA has not said as much, but the court presumes that NeLMA intends no further action in this forum on the merits of its claims against Jackson, in light of the judgment it received in the Bankruptcy Court.  But, absent any action by NeLMA, that is merely a presumption.

Given that NeLMA has now prevailed against both Northern States and Jackson, albeit in two different courts, the time seems ripe to "determine whether the fee award should run jointly and severally against the defendants or, if not, what portion of the award each defendant should bear."  Torres-Rivera

2

v. O'Neill-Cancel, 524 F.3d 331, 337 (1st Cir. 2008) (citing Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 959 (1st Cir. 1984)).

This is not a case in which two legally distinct individuals each acted unlawfully.  Rather, through the operation of respondeat superior, Jackson's actions were Northern States' actions.  Jackson and Northern States were sued in tandem and they defended in tandem, until their shared counsel withdrew, causing Northern States to be defaulted when it was unable to retain new counsel and could not be represented by Jackson.  For his part, Jackson continued to defend himself in this case pro se until he filed for bankruptcy protection, thus staying NeLMA's claims against him.

All other things being equal, the circumstances of this case would seem to call for joint and several liability for attorneys' fees.  See Evident Corp. v. Church & Dwight Co., 399 F.3d 1310, 1316 (Fed. Cir. 2005) (affirming trial court's imposition of joint and several liability for attorneys' fees in patent infringement action where counterclaim defendants shared counsel throughout litigation and "it appear[ed] that there [was no] clear division between the arguments" presented by those parties); cf. Turner v. D.C. Bd. of Elections & Ethics, 354 F.3d 890, 898 (D.C. Cir. 2004) (explaining, in action for fees under

3

42 U.S.C. § 1988, that "in this circuit, a plaintiff's fully compensatory fee for claims 'centered on a set of common issues' against two or more jointly responsible defendants should be assessed jointly and severally" (quoting Action on Smoking & Health v. Civil Aero. Bd., 724 F.2d 211, 216 (D.C. Cir. 1984)); Anderson v. Griffin, 397 F.3d 515, 522-23 (7th Cir. 2005) (noting presumptive rule that costs are assessed on a joint and several basis).

But, all other things are not equal.  Jackson was protected by the automatic stay in bankruptcy from August 26, 2010, until November 29, at the earliest, when he received a discharge.  See 11 U.S.C. § 362(c)(2)(C).  Ordinarily, that would cause the court to consider carving out a span of time during which it would be inappropriate for liability for attorneys' fees to run jointly and severally, given Jackson's absence from this action. However, given the Bankruptcy Court's judgment against Jackson on claims based on the same conduct that underpinned the claims that were stayed in this court, and the fact that the Bankruptcy Court's ruling on attorney's fees did not suggest any impropriety in holding Jackson liable for attorneys' fees spanning the full course of the action in this forum, the court concludes that liability for attorneys' fees should run jointly and severally.

**Aiming for the Lodestar**

Having settled the legal question of apportionment, see Turner, 354 F.3d at 896 (characterizing decision on apportionment as question of law), the court turns to the amount of the fee award, a matter within this court's discretion, see Spooner v. EEN, Inc., 644 F.3d 62, 66 (1st Cir. 2011) (citation omitted), and on which NeLMA bears the burden of proof, see Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."); Spooner, 644 F.3d at 68 ("The obligation to support both the time and rate components rests with the party seeking the award."). Calculating a proper fee award begins with establishing the so-called "lodestar," see id. at 67, which, in turn, "requires the district court to ascertain the number of hours productively expended and multiply that time by reasonable hourly rates," id. at 68 (citing Hensley, 461 U.S. at 433; Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 295 (1st Cir. 2001)). Although the lodestar amount 'represents a presumptively reasonable fee," the court may adjust it up or down for other factors, say, a significant gap between the relief requested and the result obtained." Spooner, 644 F.3d at 68 (quoting Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir.

1992); citing De Jesús Nazario v. Morris Rodríguez, 554 F.3d
196, 207 (1st Cir. 2009)).

Before turning to the lodestar, the court notes its general
uneasiness with the idea of awarding NeLMA more than $90,000 in
fees for securing a default judgment.  In Malletier v. Apex
Creative International Corp., 687 F. Supp. 2d 347 (S.D.N.Y.
2010), a trademark infringement case, a plaintiff who received a
default judgment asked for $30,602.09 in attorneys' fees, id. at
358, and was awarded $22,236.16, id. at 364.  In Malletier,
which the magistrate judge described as a "relatively
straightforward trademark action," id. at 363, the court reduced
the number of hours used to calculate the loadstar by fifteen
percent, to approximately forty-eight hours of attorney time and
thirty-eight hours of staff time, id.  In Yahoo!, Inc. v. Net
Games, Inc., 329 F. Supp. 2d 1179 (N.D. Cal. 2004), a trademark
infringement case, a plaintiff who received a default judgment
asked for $31,121.56 in attorneys' fees, id. at 1181, and was
awarded $16,964, id. at 1193, based on "74.4 hours of attorney
time and 40.4 hours of legal assistant time," id. at 1189.  In
Jackson v. Sturkie, 255 F. Supp. 2d 1096, 1105 (N.D. Cal. 2003),
a copyright infringement case, a plaintiff who received a
default judgment was awarded $9,342.20 in attorneys' fees, based
on 57.47 hours of attorney time and 10.31 hours of legal

assistant time, id. at 1105.  Finally, in Phat Fashions LLC v. Blue Max Corp., No. 01 Civ.3933 KMW RLE, 2005 WL 1221838 (S.D.N.Y. May 2, 2005), a trademark infringement case, a plaintiff who received a default judgment asked for $54,229.85 in attorneys' fees, and was awarded $15,000, based on fifty hours of attorney time, id. at *3.

While the declaration of Attorney Burns submitted in support of NeLMA's request for fees is far from clear on this point, the fee request appears to be based on more than 400 hours of attorney time and 1.4 hours of staff time.[1]  In the context of Malletier, Yahoo!, Jackson, and Phat Fashions, NeLMA's request for more than $90,000 seems excessive.  That said, the court turns to the two key factors for establishing a lodestar, the number of hours expended and the hourly rate.

**Number of Hours**.  "The party claiming attorneys' fees bears the burden of proving the reasonableness of the hours it claims."  Burke v. McDonald, 572 F.3d 51, 63 (1st Cir. 2009) (citation omitted); see also Spooner, 644 F.3d at 68.  As noted,

---

[1] Attorney Burns's declaration lists 473.9 hours of time, billed at a total of $120,986.30, but Attorney Burns deducted $27,720.50 from that figure to reach the total of $93,265.80 that NeLMA requests.  Attorney Burns does not indicate how many hours, or whose hours, account for the deduction.  Moreover, while Attorney Burns lists eighteen different timekeepers, and attaches hourly rates to each, he does not indicate what positions those timekeepers held.  Accordingly, the court assumes that the three timekeepers billed at $105 per hour or less are support staff rather than attorneys.

NeLMA seeks fees for more than 400 hours of legal work.  In its January 31 order, the court eliminated nearly twenty hours of attorney time because it was related solely to NeLMA's state-law causes of action.  The court also noted its concern about possible overstaffing.  The issue of overstaffing was addressed in a report prepared for NeLMA by Attorney Frank Mesmer. According to Attorney Mesmer:

> Any litigation is usually a team effort.  All litigation is expensive.  . . .  In service to the client, the division of labor and delegation of tasks to lower-cost personnel helps to expedite productivity and lower the fees charged.
>
> This particular case, as I understand it, involved quite a few pleadings, an active discovery period, research requirements involving intellectual property issues and procedural questions, and ultimately a favorable result for Attorney Burns' client.  . . .  Despite his acknowledged infringement, the defendant nonetheless maintained a vigorous defense over an extended period of time.  Addressing the substantive and procedural defense challenges asserted by a skilled Boston litigator would require a strong litigation team with expertise in intellectual property law.  A practitioner with less skill and fewer resources, including human resources, could run into trouble countering that kind of sophisticated defense.
>
> . . .  The prosecution and defense of State and Federal trademark infringement claims in this case required the advanced expertise of seasoned intellectual property litigators.

Pl.'s First Resp., Ex. 1 (doc. no. 69-1), at 3-4.  Attorney Mesmer's report raises more questions than it answers.

To begin, Attorney Mesmer seems to endorse the practice of delegating tasks to lower-cost personnel, yet he does not indicate how delegation might be at work in this case, where the highest-billing attorney accounts for more than forty-one percent of the time expended and more than fifty-eight percent of the fees charged.  In other words, Attorney Mesmer's report does nothing to allay the court's previously expressed concerns over the "upside-down pyramid" billing profile in this case. NeLMA has also submitted an affidavit from Attorney Burns that discusses the justification for the number of hours he billed in this case at his customary rates.  However, when the hourly rate for legal work is at issue, more is required than the affidavit of the billing attorney.  See Blum v. Stenson, 465 U.S. 886, 896 (1984).  And, indeed, in its January 31 order, the court expressly directed NeLMA to submit independent expert evidence on the level of experience necessary to perform the tasks for which Attorney Burns has billed NeLMA.  NeLMA has submitted no such evidence.

The court is also somewhat puzzled by Attorney Mesmer's reference to the trouble NeLMA could have run into when countering Northern States' "sophisticated defense."  Shortly after filing its complaint, NeLMA moved for: (1) the seizure of goods and counterfeit marks; (2) preliminary injunctive relief;

and (3) expedited discovery.  Northern States and Jackson duly
objected.  NeLMA replied to only one of those three objections,
and rather than directly countering the Lanham Act arguments in
defendants' objection to its application for the seizure of
goods and counterfeit marks, NeLMA characterized defendants'
arguments as "hyper-technical," Pl.'s Mem. of Law (doc. no. 15-
1), at 1, and argued only the facts.  In addition, while
Attorney Mesmer describes NeLMA as having to counter a "vigorous
defense," defendants initiated very little contested motion
practice,[2] and filed no dispositive motions.  In sum, defendants'
vigorous sophisticated defense consisted of not much more than
answers to NeLMA's original and amended complaints and responses
to NeLMA's motion practice, and culminated with Northern States'
default and Jackson's bankruptcy stay.

Finally, while Attorney Mesmer stated that NeLMA "required
the advanced expertise of seasoned intellectual property
litigators" to pursue its claims, his first report provided no

---

[2] Defendants filed six motions: (1) a motion for leave to
file a response and objection to NeLMA's ex parte application
for seizure of goods and counterfeit marks (to which NeLMA did
not object); (2) an assented-to motion for Jeffrey Snow to
appear pro hac vice; (3) an assented-to motion to continue a
hearing (to which NeLMA responded); (4) a motion for leave to
file a supplemental memorandum and objection in support of their
objections to NeLMA's motions (to which NeLMA did not object);
(5) an assented-to motion for a protective order; and (6)
defendants' attorneys' consented-to motion to withdraw (to which
NeLMA responded).

information about the qualifications of the attorneys that NeLMA employed.  That is, neither Attorney Mesmer nor NeLMA showed that any intellectual property litigators worked on NeLMA's case, much less the "seasoned" intellectual property litigators Attorney Mesmer said were required.

With regard to the number of hours spent on this case, NeLMA has not met its burden of showing the reasonableness of its request.  This case certainly progressed further than Malletier and Phat Fashions, where the defendants did not even answer the complaints against them.  See Malletier, 687 F. Supp. 2d at 351, 363 (awarding fees for forty-eight hours of attorney time and thirty-eight hours of staff time); Phat Fashions, 2005 WL 1221838, at *1, *3 (awarding fees for fifty hours of work). But, on the other hand, this case may have progressed as far as Jackson, which Judge Walker characterized as following a "tortuous path," 255 F. Supp. 2d at 1098,[3] and in which he awarded the plaintiff fees for 57.47 hours of attorney time and 10.31 hours of legal assistant time.

In any event, the path this case has followed includes at least one major event for which NeLMA is entitled to

---

[3] That "tortuous path" included multiple motions for default judgment, the withdrawal of defendant's counsel due to defendant's failure to pay his bills, and a settlement agreement that resulted in a consent decree.  See 255 F. Supp. 2d at 1098-99.

substantially less than the full amount it requests: its motion
for summary judgment.  NeLMA moved for summary judgment against
Jackson and Northern States on both its Consumer Protection Act
("CPA") and Lanham Act claims.  It prevailed on its CPA claim,
but was denied summary judgment on its Lanham Act claims.
Accordingly, NeLMA is not entitled to the attorneys' fees it
spent moving for summary judgment on those claims.  See United
States v. One Star Class Sloop Sailboat, 546 F.3d 26, 39 (1st
Cir. 2008) ("time invested in issues that are litigated . . .
without benefit to the prevailing party may be disallowed")
(citing Lipsett, 975 F.2d at 937; Grendel's Den, 749 F.2d at
952-55; Hensley, 461 U.S. at 436-37.  Surely, NeLMA gained no
benefit vis à vis its Lanham Act claims by unsuccessfully moving
for summary judgment on them.

    The billing records NeLMA submitted also include
approximately ten hours of time devoted to pursuing a contempt
order against Jackson.  That litigation took place after
Northern States had been defaulted, and the order resulting
therefrom provided for an award of attorneys' fees to be paid by
Jackson.  Northern States cannot be held liable for the
attorneys' fees associated with NeLMA's securing a contempt
order against Jackson.

In sum, the billing records in this case include a substantial number of hours of legal work for which NeLMA is not entitled to recover attorneys' fees from Northern States.

**Reasonable Hourly Rate.**  "[T]he burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum, 465 U.S. at 896 (emphasis added); see also Spooner, 644 F.3d at 68.  "Appropriate supporting documentation includes counsel's contemporaneous time and billing records and information establishing the usual and customary rates in the marketplace for comparably credentialed counsel."  Id. (emphasis added).

Problems abound with regard to the hourly rates in this case.  In its January 31 order, the court noted its need to "have documentation of the qualifications of each of the eighteen attorneys and paralegals whose fees NeLMA seeks to recover."  Order (doc. no. 68), at 24.  Accordingly, the court directed NeLMA to submit:

> (1) information documenting the qualifications of the
> various attorneys and paralegals whose fees it seeks to
> recover; (2) independent expert evidence on: (a) the fees
> charged in the local community by attorneys and
> paralegals with qualifications similar to those who
> litigated this case; (b) the level of experience

> necessary to perform the tasks for which Attorney Burns
> has billed NeLMA; and (c) the degree to which, if any,
> this litigation was overstaffed; and (3) a memorandum of
> law on the issue of apportionment.

Id. at 29.

With regard to item (1), NeLMA has provided no information

other than Attorney Mesmer's reports, the first of which was

entirely deficient, and the second of which is not much better.

The second report indicates that Attorney Burns has twenty-five

years of experience in the forest products industry, and has

been A-V rated by Martindale-Hubble for more than twenty years.

For all the other attorneys, however, Mesmer's report lists

their various practice areas, but says nothing about their

relative levels of experience.  While it is useful to know, for

example, that Attorney Albert-Knopp is a member of his firm's

Litigation Practice Group, in order to determine whether the

hourly rate charged for his services is in line with the rates

"prevailing in the community for similar services by lawyers of

reasonably comparable skill, experience and reputation,"

Grendel's Den, 749 F.2d at 955, it is necessary to know at least

something about Attorney Albert-Knopp's levels of skill,

experience and reputation.  See, e.g., Malletier, 687 F. Supp.

2d at 360 (listing dates of admission to the bar for attorneys

whose fees were awarded to trademark-infringement plaintiff).

That is, the court needs to know, at the very least, how long

14

Attorney Albert-Knopp has been a litigator and how his litigation skills are regarded in the relevant legal community.

NeLMA has provided no information on skill, experience, or reputation for any attorney other than Burns.  Beyond that, Attorney Mesmer's opinion does not even go so far as to say, in a conclusory way, that the rates charged by the attorneys in this case are commensurate with those charged by attorneys with similar skills and experience in the relevant market.  And, Attorney Mesmer's report provides no "information establishing the usual and customary rates in the marketplace for comparably credentialed counsel."  Spooner, 644 F.3d at 68.  Rather, Attorney Mesmer merely states: "The hours spent and rates billed are appropriate.  Given the complexity of this exceptional case, the time involved, and the legal talent used, $93,265.80 in attorneys' fees is not unreasonable."  Pl.'s Second Resp., Ex. 2 (doc. no. 71-2), at 5).  That is insufficient.

By way of contrast, the court notes the kind of analysis a fee-awarding court should be able to perform, based upon the submission of proper documentation by the fee claimant:

> 45. The rates charged by the Mintz Levin
> attorneys, while on the high side, appear reasonable.
> Theodore Max's hourly rate of between $475 and $540,
> for example, appears reasonable in light of his
> approximately twenty-four years' experience in the
> practice of law and the fact that he practices
> intellectual property law at a large Manhattan law
> firm.

> . . . .
>
>    47. The hourly rates of $390.00 to $470.00
> charged by the associates and junior partner
> representing Vuitton fall at the very top of the
> spectrum of reasonable hourly rates for associates.
> Even considering the fact that LeGrand has been
> practicing for eleven years and has published several
> articles on intellectual property, his hourly rate is
> higher than some courts in this circuit would allow
> (LeGrand Decl. ¶ 11).  . . .  In this case, I conclude
> that LeGrand's hourly rate is reasonable given his
> years of experience, his specialization in
> intellectual property, his employment with a mid-size
> New York law-firm, and the fact that his rate was also
> discounted, beginning in October 2004, to rates of
> $344 to $390.10 per hour.

Malletier, 687 F. Supp. 2d at 360-62 (emphasis added).  Here,

the court is unable to perform such an analysis because NeLMA

has provided the court with no information on the qualifications

of its attorneys, other than their practice areas, and no

information on the usual and customary billing rates in the

relevant marketplace.

Attorney Mesmer's report is equally deficient with respect

to item (2)(a).  Because Attorney Mesmer did not indicate the

qualifications of the attorneys who litigated this case,

necessarily, his opinion cannot count as "independent expert

evidence on . . . the fees charged in the local community by

attorneys and paralegals with qualifications similar to those

who litigated this case."  Moreover, as noted above, Attorney

Mesmer's report nowhere addresses item 2(b), "the level of

experience necessary to perform the tasks for which Attorney

Burns has billed NeLMA."

Finally, the court turns to a significant inconsistency in

Attorney Mesmer's reports.  In his first report, he noted that

this case "required the advanced expertise of seasoned

intellectual property litigators."  In his second report, he

indicates the practice areas of the five top timekeepers on

NeLMA's file.  Neither of the top two timekeepers, Attorney

Burns (198.4 hours) and Attorney Minton (99.6) hours, are

described as being intellectual-property litigators or even

members of an intellectual-property practice group.  Attorney

Burns's "specialty is litigation and [the] forest products

industry," Pl.'s Second Resp., Ex. 2, at 4, and Attorney

Minton's "specialty is commercial litigation and environmental

and natural resources," id.  The two attorneys who do specialize

in intellectual property, Attorney Murphy and Attorney Albert-

Knopp, together billed approximately ninety hours.  (But, again,

the court has been provided with no information about when these

attorneys were admitted to the bar and the nature of their

intellectual-property practices.)  If the legal complexity of

this case were a function of its intellectual-property

component, as Attorney Mesmer suggests, one is left to wonder

why so little of the work, comparatively speaking, was done by

17

attorneys who specialize in intellectual property, and one must also wonder about the centrality of the work performed by lawyers who specialize in areas other than intellectual property.

To restate, Attorney Mesmer's report raises more questions than it answers with regard to the appropriate hourly rate for the legal services provided to NeLMA. Most of the information the court needs to perform a lodestar calculation should have been provided in NeLMA's initial request for attorneys' fees, but was not. Now, having expressly requested that information, and having pointed out the insufficiency of NeLMA's first attempt to provide it, the court is left to its own devices.

In Malletier, the court noted numerous deficiencies in the plaintiff's attempt to demonstrate the reasonableness of the hourly rates for several of the attorneys in the case. See 687 F. Supp. 2d at 362. In response, the court noted that "[w]here the moving party fails to provide information on the attorneys' and paralegals' backgrounds and experience, courts have used their discretion to award fees at a rate lower than requested." Id. (quoting Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC, 553 F. Supp. 2d 201, 209 (E.D.N.Y. 2008); citing Nat'l Ass'n for the Specialty Food Trade, Inc. v. Construct Data Verlag AG, No. 04 Civ. 2983(DLC)(KNF), 2006 WL

5804603, at *6 (S.D.N.Y. Dec. 11, 2006); Yea Kim v. 167 Nail

Plaza, Inc., No. 05 Civ. 8560(GBD)(GWG), 2009 WL 77876, at *9

(S.D.N.Y. Jan. 12, 2009); Century 21 Real Estate, LLC v. Raritan

Bay Realty, Ltd., No. CV-07-1455 (CPS), 2008 WL 4190955, at *10

(E.D.N.Y. Sept. 3, 2008); Cruz v. Local Union No. 3 of the Int'l

Bhd. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994)).  A

similar approach is warranted here.


**The Fee Award**

In light of the court's clearly expressed concerns with

various aspects of NeLMA's fee request, and NeLMA's continuing

inability to address those concerns and satisfy its burden of

proof, the court is in no position to perform a traditional

lodestar analysis.  Accordingly, the court is guided by the

strategy employed in Phat Fashions.  In that case, when

presented with inadequate billing records, the court relied on

the activities documented in the record and its own

observations, and made a fee award based on fifty hours at an

average rate of $300 per hour.  See 2005 WL 1221838, at *3.

Here, the court determines that NeLMA should be awarded $37,500

in attorneys' fees, based on 150 hours at $250 per hour.

In the court's survey of fee awards in trademark cases

resulting in default judgments, the largest number of hours

compensated was the 74.4 hours of attorney time and 40.4 hours of legal assistant time in Yahoo!.  See 329 F. Supp. 2d at 1189.[4] Given that NeLMA did not just file a complaint, but also litigated a motion for seizure of goods and counterfeit marks, a motion for preliminary injunctive relief, and a motion for discovery, 150 hours is a reasonable amount of attorney time for litigating this otherwise straightforward trademark infringement case.

The court draws the billing rate of $250 per hour directly from Attorney Mesmer's initial report, in which he stated that his boutique intellectual property firm bills $250 per hour for attorneys.  That rate is below the rate billed by Attorney Burns, but NeLMA's expert has opined that the principal issues in this case involved intellectual property, and NeLMA has made no showing that Attorney Burns is a specialist in intellectual-property law.  On the other hand, the rate the court has chosen is well above the rates claimed by any of the other dozen billing attorneys in this case, including the two intellectual-property specialists.  On balance, the court is confident that $250 per hour falls within the range of what is reasonable, and perhaps tends toward the generous end of the range.

---

[4] The total number of hours in the other three cases were: eighty-six in Malletier, see 687 F. Supp. 2d at 363, sixty-eight in Jackson, see 255 F. Supp. 2d at 1105, and fifty in Phat Fashions, see 2005 WL 1221838, at *3.

**Conclusion**

For the reasons given, NeLMA is entitled to a total of $37,500 in attorneys' fees plus costs of $1,962. That award includes the costs of the fee litigation. Determination of the fee award, however, is not the end of this case. Judgment has been entered against Northern States, but Jackson remains a defendant, and it would appear that the bankruptcy stay is no longer in effect. For the purpose of imposing joint and several liability for attorneys' fees, the court presumed that NeLMA intends no further action against Jackson in this forum, but even so, the ball remains in NeLMA's court to determine how it intends to proceed with regard to Jackson – a point the court made, without response from NeLMA, in its order of May 10, 2011.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

September 15, 2011

cc:  George F. Burns, Esq.
     Dawnangela A. Minton, Esq.
     James H. Jackson, Esq.